# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-01333-COA

**OCTAVIUS COLLINS A/K/A OCTAVIS COLLINS A/K/A OCTAVIOUS COLLINS A/K/A OCTAVIUS MONROE COLLINS**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/06/2023 |
| TRIAL JUDGE: | HON. LEE JACKSON HOWARD V |
| COURT FROM WHICH APPEALED: | CLAY COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | AUTUMN BREEDEN SMITH |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: DANIELLE LOVE BURKS |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/04/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**LASSITTER ST. PÉ, J., FOR THE COURT:**

¶1.     Octavius Collins was convicted of the second-degree murder of James Roberson in the Circuit Court of Clay County. Consequently, the circuit court sentenced Collins to serve forty years in the Mississippi Department of Corrections, with ten years suspended, followed by post-release supervision. On appeal, Collins argues that the *Weathersby*[1] rule afforded him an absolute legal defense and that the trial court erred by denying his motion for a directed verdict. He also claims he received ineffective assistance of counsel. However, after our

---

[1] *Weathersby v. State*, 165 Miss 207, 147 So. 481 (1933).

review, we find no reversible error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. On November 25, 2020, Octavius Collins was at the Windale Apartments with his girlfriend Tracy Roberson (Tracy) and her brother, James Roberson (Roberson). Tracy went to bed at approximately 10:00 p.m., and roughly three hours later, in the early hours of November 26, Collins shot and killed Roberson. Collins was then indicted by a Clay County grand jury for the first-degree murder of Roberson pursuant to Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2020). Collins's trial began in April 2023, and he was convicted of the lesser-included offense of second-degree murder.

¶3. At trial, Collins claimed that he had shot Roberson in self-defense. Collins testified that as he was in the kitchen, which he described as a "tight" space, Roberson entered the kitchen and "bumped" him. Collins and Roberson then got into a verbal altercation. Collins then left the kitchen and went to the living room and retrieved a gun from the couch. Roberson followed Collins into the living room and allegedly told Collins, "I know you got a weapon. I'm gonna take that weapon and whoop your . . . ass with it." Collins claimed that he responded by telling Roberson to "back up off [him]" and to "leave [him] alone," but Roberson "kept coming" toward him. Collins stated that he "knew" Roberson was going to hurt him, so he shot Roberson once; but Roberson "didn't do anything," so Collins fired the second shot. After the second shot hit Roberson, Roberson fell against the wall.

¶4. Collins stated that after Roberson fell, he went to Tracy's room and told her that he

2

had shot Roberson, and she needed to call 911 to "get him some help." Collins then left the complex with the gun, and Tracy called the West Point Police Department to report that Roberson had been shot.

¶5.     While police and paramedics went to the complex, Collins drove to his other residence where he rented a room. Once he arrived, he placed the gun in a BBQ grill and later received a text from Tracy informing him that Roberson had died. Collins then went back to Windale and was taken into custody by law enforcement.

¶6.     Officers Traver Jung and Jacob Moss were two of the first officers on the scene, and at trial, both men were called as witnesses by the State. Officer Jung stated that once police arrived at the apartment complex, he activated his body camera and rushed to Tracy's apartment.[2] Upon their arrival, they saw Roberson on the floor "losing a lot of blood." Officer Jung also stated that he observed two gunshot wounds to Roberson, "one in the shoulder and the other [in] kind of [the] chest area." Roberson succumbed to his injuries.

¶7.     Officer Jung testified that when Collins returned to the apartment complex on the morning of November 26, he spoke briefly with Collins. Officer Jung testified that he heard Collins say he killed Roberson and "knew where the gun was." Jung then reported the gun's location to another officer, and the gun was discovered at Collins's other address inside the grill.

---

[2] Officer Jung's body-camera footage was submitted into evidence and published to the jury over Collins's objection.

3

¶8.    Moss also spoke with Tracy and learned that Collins had admitted to her that he shot Roberson. Accordingly, Moss arrested Collins after he returned to the scene. When asked to describe Collins's demeanor upon returning to the complex, Moss stated that Collins "didn't show any emotion, none at all." During cross-examination, Moss acknowledged that he could not say whether Collins acted in self-defense, nor could he provide any evidence of "why" Roberson was shot.

¶9.    Tracy testified that Roberson had been living with her and Collins for approximately three months before the shooting occurred, and in that time, Collins never indicated to her that he was afraid of Roberson. However, she did say that in the ten years she dated Collins, he and Roberson never got along, although she did not know why. Tracy also testified that Collins usually kept the gun in an apartment drawer, but when she went to bed, the gun was "in the cushion . . . on the [living room] couch."

¶10.    She went on to say that on the night her brother died, there were no signs of trouble brewing between the two men, and the three of them had all been "up drinking" until she went to bed around 10:00 p.m. When she went to sleep, Collins and Roberson were in separate rooms listening to music, and the next thing she remembered was Collins coming into her room, waking her up, and telling her that he had shot Roberson. According to Tracy, Collins apparently said, "I shot your brother, but he's not hurt. Call the ambulance[,]" and then left the apartment. Collins did not tell her why he shot Roberson nor how many times Roberson had been shot. Tracy then got up to see if Collins was telling the truth and found

4

Roberson bleeding on the floor.

¶11.    The final witness called by the State was Detective Ramirez Ivy, the lead investigator. When he arrived at the Windale Apartments, Detective Ivy processed the crime scene. Ivy took photos showing the position of Roberson's body, the blood spatter, and the location of the shell casings. Those photos were published to the jury over the defense's objection. Ivy testified that no weapons were found near Roberson's hands and that he did not observe any gunpowder burns on Roberson's body. Ivy explained that if there were gunpowder burns on Roberson, it "would have indicated that the shooter was in close proximity to the . . . victim," but the absence of these burns indicates that Collins was not in close proximity to Roberson when he fired the shots.

¶12.    Detective Ivy also spoke with Tracy and learned that Collins and Roberson had "never" gotten along. Tracy also mentioned that Collins had been complaining about Roberson earlier that day.

¶13.    Detective Ivy attempted to speak with Collins at the police station, but Collins "reeked of alcohol," so Detective Ivy had Collins transported to the Clay County Jail to sober up. The next day, Detective Ivy interviewed Collins at the jail. Although the interview was recorded, the recording was not submitted into evidence. However, Ivy drafted a written report after the interview, which was submitted into evidence. After Collins signed a *Miranda*[3] waiver, he told Ivy that he had shot Roberson in self-defense. Collins also told Ivy that he never got

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

along with Roberson and characterized Roberson as a "bully." According to Ivy, Collins told him that he and Roberson had gotten into a "verbal altercation" in the kitchen after Roberson bumped him.

¶14. Collins claimed to Detective Ivy that after Roberson followed him into the living room, Roberson told him, "I know you got a mother f***ing gun. I ain't scared of your mother f***ing gun. I'll take your gun and beat your mother f***ing ass." Collins went on to tell Ivy that he warned Roberson to "back up off me" but Roberson "kept coming," so he reached to the couch "in-between the cushions and got the gun."

¶15. Collins told Ivy that as Roberson "came at him," he shot Roberson once, but Roberson said, "I've been shot before. That ain't nothing," and kept coming towards him, so he shot Roberson a second time. Ivy stated that Collins never explained why he chose not to call 911 after shooting Roberson, or why Tracy was the one who needed to contact 911. Collins also told Ivy that after waking Tracy up, he left the apartment complex and took the gun to his other apartment.

¶16. Ivy also asked Collins if Roberson had been holding a weapon when he approached him in the living room, but Collins replied that he could not remember. Collins concluded by telling Ivy that he returned to the apartment complex after Tracy told him Roberson had died to "turn himself in because he didn't want a manhunt after him."

¶17. After interviewing Collins, Detective Ivy obtained security footage from the Windale Apartments. The State moved to have the security footage played by the jury, but the defense

objected, claiming the videos were "inaudible" and did not "accurately reflect the scene of the things that actually happened." The objection was overruled, and the footage was published to the jury. In the videos Collins can be seen exiting the apartment, walking to his car, and then driving away. Moments before Collins appears on video, yelling or raised voice(s) can be heard, followed by two gunshots in quick succession.

¶18.    After a brief cross-examination and redirect, Ivy was released from the stand, and the State rested. The jury was then excused, and the defense moved for a directed verdict, which the court denied.

¶19.    Collins then took the stand. Collins explained that prior to the altercation with Roberson, he was "feeling pretty good" and bore Roberson no ill will. Collins also claimed that he was not aggressive toward Roberson in any way before the shooting. When asked how the altercation with Roberson began, Collins explained he was washing chitlins in the kitchen sink in preparation for Thanksgiving when Roberson entered the kitchen and "bumped" into him.

¶20.    According to Collins the kitchen was a "tight" space with very little room to maneuver, so he asked Roberson, "[B]ro, you don't see me working in here?" Collins claimed this caused Roberson to go "haywire" and become "aggressive." Collins stated that Roberson then began "ranting" at Collins, claiming Collins did nothing to help around the house, and said that Tracy paid all the bills while Collins did nothing but watch TV.

¶21.    Collins then left the kitchen and went to the living room, where he retrieved a gun

from the couch. Roberson followed Collins into the living room and allegedly told Collins, "I know you got a weapon. I'm gonna take that weapon and whoop your . . . ass with it." Collins claimed that he responded by telling Roberson to "back up off [him]" and to "leave [him] alone," but Roberson "kept coming" toward him. Collins stated that he "knew" Roberson was going to hurt him, so he shot Roberson once; but Roberson "didn't do anything," so Collins fired the second shot.

¶22.    When asked why he shot Roberson, Collins claimed it was in self-defense because he "feared for [his] life" and to "stop [Roberson] from hurting me." Collins went on to say that he was diagnosed with Lupus in 2014, and therefore, he could not get bumped, hit, or bruised and believed Roberson was going to "do some damage" to him.

¶23.    Collins testified that after shooting Roberson, he went to Tracy's room, woke her up, and told her to call 911 because he had shot her brother. Collins then left the apartment, taking the gun with him. Collins claimed he told Tracy to call 911 and left the apartment because "the situation could [have gotten] worse" if he was at the apartment when the police arrived.

¶24.    On cross-examination, the State asked Collins if Roberson's statements—that he did nothing around the house—made him angry, but Collins replied, "not at all," saying Roberson's claims were "wrong." When questioned about the gun, he claimed that the gun was Tracy's, but he had bought it for her. He also stated that the gun was usually kept in the bedroom in a lockbox, but Tracy had been "playing" with it earlier in the day, so he took it

from her and left it on the couch. When asked if he remembered telling Detective Ivy that the pistol was "hidden in-between the cushions of the couch," Collins said the gun was never "hidden." Instead, he claimed the pistol was simply "on the couch," where he had left it. When asked why he did not exit the apartment or call the police instead of shooting Roberson, Collins replied that "he didn't have a chance."

¶25. During cross-examination Collins claimed for the first time that he shot Roberson in fear for his life because Roberson had threatened to kill him during their argument. The State questioned why Collins never mentioned Roberson's threat to Detective Ivy or during his direct examination, and Collins claimed it was because he "wasn't asked that question." Additionally, Collins acknowledged that he was the only person holding a weapon in the living room that night and that he fired the first shot when Roberson was forty inches away from him.

¶26. The State also asked Collins why he left the apartment with the gun instead of performing CPR on Roberson, remaining in the apartment, or calling the police. Collins stated that he left because in those "situation[s]" emotions run high, and because he was there with a gun, he did not "know how the police [were going to] act," so he thought it was in his best interest to leave. Collins went on to say that he left the apartment and went to his other residence because he wanted his roommate to drive him to the police station. Collins stated that when he arrived at his other residence, he remained outside waiting for his roommate to get their car keys, so he simply put the gun in the BBQ grill for the sake of convenience. He

denied that he went there to hide the gun.

¶27.   The State asked Collins why he did not drive directly to the police station instead, and he replied it was because he did not have a license. When confronted with the security footage that showed him driving a vehicle away from the Windale apartment complex, Collins explained that he did not want to leave his car at the police station.

¶28.   Furthermore, the State asked Collins if he remembered telling Detective Ivy that in between shots one and two, Roberson said, "I've been shot before. This don't phase me," and Collins replied, "yes." Collins then reiterated that Roberson had spoken in between the shots. Yet Collins also acknowledged that the surveillance footage captured the sound of two shots being fired in quick succession with no audible voices or talking between shots. Collins called no other witnesses, and both sides rested. Collins renewed his motion for a directed verdict, which was denied. The jury found Collins guilty of second-degree murder, and the trial court sentenced him to forty years in the Mississippi Department of Corrections, with thirty years to serve, ten years suspended, and ten years of post-release supervision.

¶29.   Collins filed a motion for a judgment notwithstanding the verdict or a new trial, claiming that the circuit court committed error by failing to grant him a directed verdict in accordance with the *Weathersby* rule and that he received ineffective assistance of counsel.[4] The circuit court found Collins's post-trial motion without merit and denied it. Collins then

---

[4] Collins's trial counsel filed this motion, asserting his own ineffectiveness.

filed the instant appeal.[5]

## ANALYSIS

### I.  The *Weathersby* Rule

¶30.  On appeal, Collins argues that the circuit court erred by not granting him a directed verdict of acquittal under the *Weathersby* rule. However, Collins is mistaken, as the rule did not apply in the instant case.

¶31.  We begin by noting that Collins's motions for a directed verdict and judgment notwithstanding the verdict challenge the legal sufficiency of the evidence supporting his conviction. "[R]eversal is warranted where . . . a reasonable and fair-minded juror could only find the accused not guilty." *Thomas v. State*, 416 So. 3d 102, 110-11 (¶19) (Miss. Ct. App. 2025).

¶32.  Additionally, the *Weathersby* rule states that "where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge." *Morrison v. State*, 332 So. 3d 396, 400 (¶19) (Miss. Ct. App. 2022) (citing *Weathersby v. State*, 165 Miss. 207, 147 So. 481, 482 (1933)). "Where the *Weathersby* rule applies and the defendant's version affords an absolute legal defense, the defendant is entitled to a directed

---

[5] Although it does not affect this Court's disposition, we note that Collins was granted an out-of-time appeal.

verdict of acquittal." *Thomas*, 416 So. 3d at 111 (¶20).

¶33. However, "it is a rare case that meets all of the requirements of the *Weathersby* rule." *Id.* Moreover, the rule does not apply when "the defendant's conduct and statements following the killing are inconsistent with his version of the events as recounted at trial." *Morrison*, 332 So. 3d at 401 (¶20). Lastly, the "defendant's version must be reasonable and credible before he is entitled to an acquittal under the rule." *Strickland v. State*, 192 So. 3d 1105, 1108 (¶11) (Miss. Ct. App. 2016).

¶34. It is undisputed that Collins, Tracy, and Roberson were the only ones in the apartment when Roberson was shot. Accordingly, Collins argues that under *Weathersby* he was entitled to a directed verdict because he was the only eyewitness to the shooting and because the State failed to provide substantial evidence to contradict his version of events. Therefore, he claims that his version should have been accepted as true and that the circuit court committed error by denying his motion for a directed verdict.

¶35. However, the State presented substantial evidence to contradict his version of events, and Collins's version of events changed from his interview to the witness stand. For example, during direct examination Collins claimed that after he fired the first shot at Roberson, Roberson "didn't do anything," so he fired the second shot. Yet, during cross-examination, Collins claimed that after the first shot, Roberson said, "I've been shot before. This don't phase me[,]" which then prompted Collins to shoot Roberson a second time. Collins also agreed that during his interview with Detective Ivy, which had occurred less than twenty-four

12

hours after the shooting, he told Ivy that Roberson had spoken between shots.

¶36.    We also note that although Collins spoke with Tracy immediately after the shooting and then Detective Ivy shortly thereafter, Collins never mentioned that Roberson had threatened to kill him that night. Yet, during cross-examination, for the very first time, Collins claimed Roberson had threatened to kill him right before the shooting. As previously stated, the *Weathersby* rule is inapplicable when "the defendant's conduct and statements following the killing are inconsistent with his version of the events as recounted at trial." *Morrison*, 332 So. 3d at 401 (¶20).

¶37.    Additionally, the surveillance footage submitted at trial captured raised voices followed by the sound of two shots in quick succession. At trial, Collins himself acknowledged that no audible voices or talking could be heard between the shots and agreed that the shots were fired almost back-to-back, contradicting Collins's shifting claim that he only shot Roberson a second time after Roberson continued to advance toward him.

¶38.    Here, Collins told distinctly different versions about his altercation with Roberson while on the stand and immediately after the shooting. As discussed *supra*, "a defendant's version must be reasonable and credible before he is entitled to an acquittal under the rule." *Strickland*, 192 So. 3d at 1108 (¶11). Accordingly, the *Weathersby* rule did not apply to this case, and the circuit court did not err in denying Collins's motion for a directed verdict, submitting these factual issues to the jury, and denying his post-trial motion seeking acquittal.

II.    **Ineffective Assistance of Counsel**

13

¶39.   Collins also claims that he received constitutionally ineffective assistance of counsel at trial. In making this argument, Collins asserts two points of error. First, he claims his trial counsel's failure to properly object to the introduction of the Windale security footage or cross-examine Detective Ivy about the video's contents demonstrated a "lack of basic proficiency in the rules of evidence" and constituted deficient representation. Additionally, he claims his counsel's failure to submit the recorded interview between Collins and Detective Ivy into evidence for the purposes of impeaching Ivy's testimony shows that his trial counsel lacked "mastery of basic evidence concepts." Collins therefore asks this Court to reverse his conviction and remand this case for a new trial.

¶40.   Regarding a defendant's claim of ineffective assistance of counsel brought via direct appeal, this Court has stated:

> A defendant is permitted to raise the issue of ineffective assistance of counsel on direct appeal. However, when this issue is raised, this Court's review is strictly limited to the appellate record. Generally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings. This Court will address such claims on direct appeal when (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed. We may also address such claims on direct appeal when the record affirmatively shows that the claims are without merit. If the record on direct appeal is insufficient to address a defendant's ineffective assistance claims, we will dismiss the claims without prejudice, preserving the defendant's right to raise the claims later in a properly filed motion for post-conviction relief.

*Doss v. State*, 398 So. 3d 933, 947 (¶65) (Miss. Ct. App. 2024).

¶41.   Although the State stipulates that the record is adequate to consider Collins's claims,

we are not bound by the State's stipulation. *See id.* at (¶66); *Harris v. State*, 378 So 3d 971, 980 (¶36) (Miss. Ct. App. 2024). As discussed *infra* in response to the dissent, there is simply too much we do not know to conclude affirmatively that Collins's counsel was or was not ineffective. "We therefore deny without prejudice [Collins's] claims of ineffective assistance so that if he chooses, he may raise them in a properly filed motion for post-conviction collateral relief (PCR)." *Doss*, 398 So. 3d at 947 (¶66).

¶42. The dissent argues that Collins's counsel's performance prejudiced the outcome of his case and that the Court should reverse and remand for a new trial. However, the dissent's arguments are premised on speculation and assumption—precisely the reason why most claims of ineffective assistance of counsel are best left for PCR proceedings.

¶43. The dissent first argues that counsel's actions regarding the apartment footage failed to bolster Collins's defense and acted to prevent true application of *Weathersby*. Collins himself argues that counsel was deficient by failing to have the video excluded. So Collins does not want the video admitted at all, while the dissent believes the video not only should have been admitted but also highlighted in order to bolster Collins's defense. This discrepancy alone should doom a finding of ineffective assistance, as it illustrates the potential strategy, not ineffective performance.

¶44. But the real issue with the dissent's position as to the apartment video is that it is based on assumption and opinion. The dissent assumes that trial counsel did not listen to the video before trial and disagrees with his assessment of the recording. Our subjective

15

interpretation of counsel's actions are not proper grounds for finding ineffective assistance.

¶45.    The dissent also questions "the sufficiency of the equipment used in the courtroom," suggesting that Collins's counsel should have ensured "the proper equipment was available." This statement requires a significant assumption on the dissent's part and highlights why so many ineffective-assistance claims are best left to PCR proceedings—because we simply cannot tell from a cold record what might have occurred. This is why in PCR proceedings, the petitioner is required to support his claims of ineffective assistance with affidavits other than his own, and it is why we cannot entertain Collins's argument on direct appeal—so that the Court does not make assumptions with no evidence to support them. *See Lindsay v. State*, 720 So. 2d 182, 184 (¶6) (Miss. 1998) ("[W]here a party offers only his affidavit, then his ineffective assistance of counsel claim is without merit.").

¶46.    As to counsel's alleged failure to challenge Ivy's testimony about Collins's interview, it is unnecessary to discuss the dissent's contentions because the dissent acknowledges that Collins cannot prevail on this issue under *Strickland*: "we cannot determine whether Collins was prejudiced" by counsel's failure to lay the foundation for impeachment. *Post* at ¶67. But even the dissent's assumption that counsel was deficient for not impeaching Ivy requires an assumption that *Ivy could have been impeached*. Plus, the decision not to impeach Ivy could have been strategic. We simply do not know because we do not have the recording.

¶47.    Finally, the dissent suggests that counsel's post-trial motion, in which he admitted his failures regarding Ivy's direct and cross-examination, supports a finding of ineffective

16

assistance. But, as stated, we cannot discern from this record whether Collins's case was impacted by these decisions. Collins's post-trial motion referred to his failure to object to "expert forensic testimony" from Ivy, who had not been accepted as an expert witness. Ivy's alleged expert testimony was that there were no burn marks on the victim, suggesting that Collins was not close to Roberson when he shot him. But Collins never claimed to be close to Roberson when he fired, only that the victim was moving closer to him during the argument.[6] It is difficult to see how this alleged failure impacted Collins's defense.

¶48.    The dissent also notes that counsel has been suspended from the practice of law by the Mississippi Supreme Court following criminal charges apparently pending during his representation of Collins. Again, the dissent notes that "[i]t is unclear from the record in the present case whether this pending criminal charge affected Carr's representation of Collins." *Post* at ¶71.  That is not the standard for a *Strickland*-level ineffective-assistance-of-counsel claim, which requires proof that counsel was deficient and that "the deficiency was so substantial as to deprive the defendant of a fair trial." *Holly v. State*, 716 So. 2d 979, 989 (¶37) (Miss. 1998) (citing *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984)).

¶49.    In sum, the dissent's problem with counsel's performance appears to be that he did a bad job. However, too much of the dissent's argument and conclusions about counsel's

_____

[6] The State's brief notes that Collins testified that Roberson was "getting too close" to him and suggests that this was why Collins claimed to have needed to act in self-defense. But Collins's testimony that Roberson was "too close" actually took place in the kitchen, not the living room, where the shooting occurred. Collins testified that he left the kitchen to get away from Roberson because Roberson was "getting too close."

decisions requires assumptions and guesswork. Not to mention that a cornerstone of the dissent's argument—that counsel should have utilized the apartment video better—is directly opposite that which Collins argues on appeal. We do not have sufficient information at this stage to conclude that counsel's actions were anything other than strategic or that they prejudiced the outcome of Collins's case.

## CONCLUSION

¶50. After our review of the record, we find that Collins was not entitled to a directed verdict under *Weathersby*. The *Weathersby* rule did not apply in the instant case, as Collins provided varying accounts of Roberson's final moments and statements. We decline to address Collins's claims of ineffective assistance of counsel on direct appeal. The judgment of conviction and sentence by the Clay County Circuit Court is affirmed.

¶51. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE AND WEDDLE, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. EMFINGER, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., AND McCARTY, J.**

**EMFINGER, J., DISSENTING:**

¶52. I cannot in good conscience vote to affirm Collins' conviction because his attorney, Charlie A. Carr, rendered constitutionally ineffective assistance of counsel at all stages of Collins' representation. Because Carr's deficient performance prejudiced Collins' defense in this case, I would reverse Collins' conviction of second-degree murder and remand the

18

matter to circuit court for a new trial. Therefore, I respectfully dissent.

¶53. On appeal, Collins' ineffective assistance of counsel argument focuses on two matters that were crucial to both the State's case and Collins' defense: (1) the admission and use of the video/audio recording from the apartment complex and (2) the cross-examination of a State's witness concerning Collins' recorded, pre-trial statement to law enforcement. In *Kirby v. State*, 379 So. 3d 915, 921 (¶¶8-9) (Miss. Ct. App. 2024), this Court explained the factors that must be considered in deciding whether Collins received ineffective assistance of counsel:

> "A strong but rebuttable presumption exists that counsel's performance was effective." *Moffett* [*v. State*], 354 So. 3d [929,] 936 (¶14) [(Miss. Ct. App. 2022)]. "[T]o prevail on a claim of ineffective assistance of counsel, a defendant must prove that his attorney's performance was deficient, and that the deficiency was so substantial as to deprive the defendant of a fair trial." *Morrow v. State*, 275 So. 3d 77, 83 (¶24) (Miss. 2019) (quoting *Holly v. State*, 716 So. 2d 979, 989 (¶37) (Miss. 1998)) (applying the two-pronged test for ineffective-assistance-of-counsel claims announced in *Strickland v. Washington*, 466 U.S. 668, 687-96, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). "**Whether counsel's efforts were both deficient and prejudicial is examined based on the totality of the circumstances**." *Reed v. State*, 204 So. 3d 785, 790 (¶17) (Miss. Ct. App. 2016). The burden of proving both prongs for ineffective assistance is on the defendant, and "[i]f either prong is not met, the claim fails." *Murray* [*v. State*], 345 So. 3d [610,] 621 (¶28) [(Miss. Ct. App. 2022)] (quoting *Havard v. State*, 928 So. 2d 771, 781 (¶8) (Miss. 2006)).
>
> "Decisions that fall within the realm of trial strategy do not amount to ineffective assistance of counsel." *Ford v. State*, 230 So. 3d 316, 320 (¶9) (Miss. Ct. App. 2017). For "matters of trial strategy, this Court generally defers to the judgment of counsel." *Braggs v. State*, 121 So. 3d 269, 275 (¶20) (Miss. Ct. App. 2013) (quoting *Houston v. State*, 887 So. 2d 808, 815 (¶34) (Miss. Ct. App. 2004)). Trial counsel's decision not to object is "presumed strategic unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness." *Greenleaf v. State*, 267 So. 3d 749,

19

752 (¶11) (Miss. 2019) (quoting *Rogers v. State*, 85 So. 3d 293, 297 (¶16) (Miss. 2012)).

(Emphasis added). We must look to the "totality of the circumstances" to determine whether Carr's representation was deficient and whether Collins was prejudiced as a result.

### I.    Pre-trial Proceedings

¶54.    Collins was indicted for first-degree murder in the shooting death of James Roberson. The death occurred on or about November 26, 2020, and the indictment was filed in circuit court on April 7, 2021. On April 12, 2021, Marlin Stewart was appointed to represent Collins, and Collins waived arraignment on the charge. Later on that same date, Carr entered his appearance as retained counsel for Collins. Carr filed a motion for discovery on April 14, 2021, and in this pleading Carr indicated that his office was in Dallas, Texas. An agreed order allowing Stewart to withdraw as Collins' attorney and substituting Carr as counsel was entered on April 23, 2021. Carr filed a second motion for discovery on May 24, 2021, along with a motion for a bond reduction for Collins.

¶55.    Court records show that on September 21, 2021, the court administrator emailed Carr, noting that the motion for bond reduction had not been set for hearing and asking whether Carr would like to set the matter for hearing on either October 4 or 8.  While no response to that email is in the record, the next action of record is Carr's request for a continuance of a scheduled appearance on October 4 due to a trial conflict with a client on that date. The court entered an order granting the continuance and setting the matter for trial on January 18, 2022.

¶56.    On January 14, 2022, Carr filed a second motion for a continuance, indicating that a

client was scheduled for a trial during the week of January 18, 2022. The motion further stated that Carr was in quarantine due to a positive COVID-19 test by a member of his household. The trial court entered an order of continuance, resetting Collins' trial for July 18, 2022. At 7:09 a.m., on the morning of Monday, July 18, Carr sent an email to the court administrator indicating that the trial date had not been placed on his calendar and that while he was ready for trial, he could not get to court before Tuesday. The administrator replied that Collins' trial would be bumped to Wednesday due to trials in other cases. On July 19, 2022, an agreed order of continuance was entered indicating that Carr had asked for additional time to prepare for trial. Collins' trial was reset for October 10, 2022. This order was signed by Carr.

¶57.　　On October 14, 2022, the trial judge signed an order continuing Collins' trial until April 3, 2023, because Carr did not appear for trial. The trial court entered an "Order Requiring State to File Show Cause Petition." In this order, the court noted that Carr had failed to appear for trial. The order stated that the District Attorney's office tried numerous times to contact Carr by phone and email, but "Carr failed or refused to respond." The order noted that because the court was "loathe to leave Defendant in jail without representation," the court removed Carr as counsel and reappointed Stewart to represent Collins.[7] An order

---

[7] There is no evidence that Carr had ever scheduled a hearing on Collins' motion for a bond reduction, well over a year after the motion was filed. The record shows that Collins posted bond in the original amount of $150,000 on October 17, 2022, days after Carr failed to appear for trial.

setting Carr's show cause hearing for January 5, 2023, was entered.

¶58.    Carr appeared on January 5 and, according to the court's order, presented a "legally sufficient excuse for his failure to appear."[8] The court entered an order allowing Carr to resume representation of Collins, whose trial remained set for April 3, 2023. A discovery conference and motion hearing date was set for March 7, 2023. The record reflects that Carr filed no pre-trial motion to challenge the admissibility of the video/audio recording from the apartment complex or any other evidence the State intended to introduce at trial. If a hearing was conducted on March 7, there is no transcript in the appellate record to show what occurred.

## II.    Trial

¶59.    On April 3, 2023, the trial court qualified the jury venire, which would be used for Collins' trial beginning the following day. On that day, Carr filed proposed defense jury instructions that included a self-defense instruction and an instruction that purported to submit the *Weathersby* rule decision to the jury.[9] Based upon the jury instructions submitted by Carr and his opening statement, it is clear that Carr's trial strategy was to show the jury that Collins shot and killed Roberson in self-defense. Carr intended to show that Collins' version of events should be sufficient to result in an acquittal pursuant to *Weathersby*. The

---

[8] There is no transcript of this hearing in the appellate record. We do not know what excuse Carr presented to the court.

[9] The *Weathersby* rule is used by the judge to determine, as a matter of law, whether the defendant is entitled to a directed verdict. It should not be submitted to the jury by an instruction. *See Vance v. State*, 429 So. 3d 912, 921-22 (¶52) (Miss. 2026).

State called seven witnesses to testify during its case-in-chief. Collins testified as the only witness in his defense, and, as noted by the majority, told the jury his version of events that led to him shooting Roberson. Collins testified he was scared that Roberson was going to hurt him. On direct examination, Collins told the jury that after they left the kitchen, Roberson came at him again in the living room, but this time Roberson was "amped up worser." Collins testified Roberson

> started clutching. He kept coming. He kept coming. You know when somebody want to do something bad to you. So I knew he gonna hurt me, so I fired the first shot, right? He didn't do anything. Fired the second shot. He fell back to the double doors in the hallway.

Collins also told the jury that he had been diagnosed with Lupus and takes an anticoagulant called Warfarin. He explained that he "can't be bumped, hit, bruised, roughhouse, none of that." Collins said that he fired the shots at Roberson "because I feared for my life. He was fixing to do some body damage to me."

¶60.    I will now address those portions of the State's case where I would find that Carr's performance was deficient *and* that it significantly prejudiced Collins' defense. First, I find that introducing the video/audio recording from the apartment complex into evidence should have bolstered Collins' self-defense claim but, instead, was used to prevent the application of the *Weathersby* rule and to impeach Collins' credibility before the jury.

¶61.    The district attorney's investigator, Ramirez Ivy, testified that he went to the Windale Apartments and retrieved a video/audio recording from a camera on the building where the

23

shooting occurred.[10] Ivy testified that the system was working correctly during the early morning hours of November 26, 2020. Ivy downloaded the recording from the apartment's system onto a thumb drive. Ivy further advised the court that the thumb drive contained an accurate copy of what was recorded on the apartment's system. The State then offered the thumb drive into evidence. Carr objected to its admission, and during a bench conference, the following exchange occurred:

| | |
|---|---|
| By Mr. Carr: | Your Honor, my objection is my *understanding* of those videos are inaudible; that they don't accurately reflect the scene of the things that actually happened, That's my objection. |
| By the Court: | That's your only objection for getting this in? |
| By Mr. Carr: | Yes. |
| By the Court: | Mr. Amos? |
| By Mr. Amos: | So number one, he can certainly cross-examine Detective Ivy, but number two, they do accurately show what occurred from the standpoint of surveillance video then and there that night or early morning of November 26, 2020, and Mr. Ivy has testified to that so they're absolutely admissible. |
| By the Court: | That specific objection that you raise, Mr. Carr, is overruled. Do you have any other objection?" |
| By Mr. Carr: | No. None, Your Honor. |

---

[10] This camera was located on the outside of a building containing numerous apartments. While the recording shows only the outside of the apartments and the area leading to the parking lot, the audio apparently picked up sounds from inside the apartments.

(Emphases added). At that point, the video/audio recordings were admitted into evidence.

¶62. In publishing the recording to the jury, the State fast-forwarded to a specific place in the recording, and the State asked Ivy, "And so, we're starting to hear voices." As they continued to play the recording, Ivy testified that he could hear only one voice and that he could not identify whose voice it was. The State then played a second video where two gunshots were heard. Ivy testified that after the gunshots, he still heard the same voice he had heard before the gunshots. This implied that the voice he heard on the recording was Collins' voice and not Roberson's. From my review of the recording, that is not correct. On cross-examination, however, Carr did not ask Ivy a single question about the *voices* on the recording.

¶63. I would reverse Collins' conviction based primarily on Carr's handling of the video/audio recording. It appears that Carr did not review, or at least did not closely review, this recording prior to trial. Carr's objection was that it was his "*understanding*" that the recordings were inaudible. Upon my review of the recording on my computer, with only computer speakers and no special equipment, I strongly disagree with Carr's assessment of the recording. I could clearly hear portions of the confrontation described by Collins where Roberson is aggressively yelling at Collins in a loud and threatening manner. Roberson repeatedly challenged Collins to shoot him. I can hear Roberson say, "I'm right here, try me and see!" and "I will show you what's up!" Roberson calls Collins a motherf***er, a pu**y, a scalawag, a b**ch, and a bastard. While it is true that portions of the exchange are not

25

audible, I can clearly make out two different voices, not just one, as testified to by Ivy. It is Roberson's loud voice that *is audible* at times and could have been used to support Collins' claim of self-defense. Had Carr reviewed this vital piece of evidence prior to trial, he should have been trying to enhance this portion of the recording and not objecting to its admission at trial.

¶64.    Further, had Carr reviewed this recording with Collins prior to trial with proper equipment, it is reasonable to believe that Collins could have identified Roberson's voice on the recording. During Carr's direct examination, he did not ask Collins one question about the recording. During Collins' cross-examination, the State asked whether he heard voices on the recording. Collins responded that he heard something, but he could not make out who it was.[11] Carr objected to the line of questioning because "[i]t's already been proven that the video was inaudible." This causes me to question the sufficiency of the equipment used in the courtroom and what may have been available to the jury during deliberations. Again, if Carr had reviewed the recording with Collins prior to trial, he should have sought to enhance a copy of the recording and made sure that the proper equipment was available so that Roberson's aggressive behavior could have been heard by the jury.

¶65.    Because of Carr's failure to hear, or failure to appreciate what could be heard, the

_____

[11] There is no evidence that Carr reviewed the recording with Collins prior to trial or that Collins heard or saw the recording other than when it was being played for the jury in the courtroom. I have no idea what could actually be heard in that setting by either Collins or the jury.

26

jury's attention was not drawn to Roberson's aggressive behavior, through the examination of witnesses or in Carr's closing argument to the jury. As stated in *Kirby* above, I would find that Carr's performance relative to the video/audio recording from the apartment complex was both deficient and prejudicial to Collins' defense.

¶66. At the close of the State's case-in-chief, Carr made a motion for a directed verdict:

> Your Honor, at this time the Defense would like to move for a directed verdict on the basis that the State hasn't met their burden of the evidence for the charges of first degree murder.

However, in *Carpenter v. State*, 400 So. 3d 493, 501-02 (¶29) (Miss. Ct. App. 2024), this Court maintained:

> The supreme court has stated that "[a] motion for a directed verdict on the grounds that the [S]tate has failed to make out a prima facie case must state specifically wherein the [S]tate has failed to make out a prima facie case. Motions for a directed verdict must be specific and not general in nature." *Sheffield v. State*, 749 So. 2d 123, 126 (¶10) (Miss. 1999) (citation omitted).

Further, at the close of all the evidence, Carr failed to renew his motion for a directed verdict, which was the appropriate time to raise the *Weathersby* rule. Instead, during the jury instruction conference after the trial court informed Carr that *Weathersby* was a question for the court, the trial court reminded Carr that he had not requested a peremptory instruction and had not renewed his motion for a directed verdict. The court advised Carr that it would be appropriate to raise *Weathersby* at that time.

¶67. Appellate counsel agrees with Carr's post-trial motion, that Carr was ineffective by failing to properly lay a foundation to challenge Ivy's testimony concerning Collins'

statements during the recorded interview. First, it is clear that because the State had not introduced any portion of the recorded interview, Collins could not introduce the entire interview. *See Simmons v. State*, 805 So. 2d 452, 489-90 (¶¶95-96) (Miss. 2001). Carr may have been able to introduce portions of the interview to impeach Ivy's testimony concerning statements made by Collins, had he laid the proper foundation. Had Carr asked Ivy whether it was true that Collins did not tell him that Roberson said anything to Collins between the shots, portions of Collins' recorded statement may have become admissible. However, we cannot know what Collins said to Ivy because Carr did not proffer the recorded statement at trial or with his post-trial motion. Therefore, while Carr's performance was deficient by not knowing how to lay the proper foundation, we cannot determine whether Collins was prejudiced by it. However, under the totality of the circumstances, this is further evidence of Carr's deficient performance and may well have further prejudiced Collins' defense.

### III.    Post-trial Proceedings

¶68.    On April 16, 2023, Carr filed a "Motion for a New Trial or/and a Judgment Notwithstanding the Verdict" on Collins' behalf. In this motion, Carr admitted his error in attempting to have the jury instructed as to the *Weathersby* rule. Carr argued that the trial court erred by not applying the rule to this case and granting Collins a judgment of acquittal. *More importantly, Carr admitted in the motion that he provided ineffective assistance of counsel for Collins*.

¶69.    In the motion, Carr specifically refers to his failure to object to expert forensic

testimony given during the State's direct examination of Detective Ivy. Ivy had not been tendered nor accepted by the court as an expert witness. Carr admitted that he compounded the error by his questioning of Ivy on cross-examination.

¶70.    Carr also admitted that he was ineffective by being unable to impeach Ivy with his recorded interview with Collins. Carr did not mention his failure to properly address the admissibility of the video/audio recordings from the apartment complex, especially regarding the voices heard on the recording. He does not mention his failure to proffer at trial, or with this motion, the recording of Ivy's interview of Collins. In fact, Carr expressly waived a hearing on his post-trial motion where he could have developed the record regarding his failure to provide constitutionally effective counsel.

### IV.    Carr's Felony Conviction and Subsequent Suspension from the Practice of Law in Texas and Mississippi

¶71.    On April 16, 2026, in Cause No. 2025-BD-00731-SCT, the Mississippi Supreme Court suspended Carr from the practice of law as a result of his Texas conviction of sexual assault.[12] Carr was sentenced to serve ten years in prison. The formal complaint filed by the Mississippi Bar reveals that the date of the offense for which he was convicted was January 20, 2021. It would appear that this criminal charge was pending during his representation of Collins. It is unclear from the record in the present case whether this pending criminal charge

---

[12] We take judicial notice of the supreme court's records in this matter which are "readily available via MEC and cannot reasonably be disputed." *See Jackson v. State*, 394 So. 3d 420, 432 (¶43) (Miss. Ct. App. 2024).

29

affected Carr's representation of Collins. I would note, however, that Carr sought numerous continuances of the trial herein due to unidentified conflicts, and Carr failed to set the motion for bond reduction for hearing, even after being reminded by the court administrator. On one occasion, Carr failed to appear for trial and was removed as counsel in Collins' case. Carr appeared for a show cause hearing on January 5, 2023, however, and presented a "legally sufficient excuse for his failure to appear." As discussed above, we have no transcript of that hearing in the appellate record, and therefore we do not know what justification was presented by Carr. Whatever the reason, we know that Carr was removed from representing Collins for a couple of months leading up to Collins' trial.

### V. Carr's Failure to Provide Constitutionally Effective Assistance of Counsel at all Stages of his Representation of Collins

¶72. The issue before us is whether Carr rendered constitutionally ineffective assistance of counsel to Collins. My focus is on Carr's failure to be prepared to properly present a vital piece of evidence, the video/audio recording, to the jury. The State used this piece of evidence to prevent the application of the *Weathersby* rule and to impeach Collins' trial testimony concerning self-defense. Carr was also not prepared to challenge Ivy's testimony concerning statements made to him by Collins in a recorded interview. The State used Ivy's testimony about these statements to prevent the application of the *Weathersby* rule and to undermine Collins' claim of self-defense. I would find that the appellate record is sufficient for us to make a determination on direct appeal.

¶73. In *Taylor v. State*, 167 So. 3d 1143, 1146 (¶5) (Miss. 2015), the supreme court stated:

> Whether a defendant has received ineffective assistance of counsel is a question of law reviewed de novo under two prongs: "[f]irst, the defendant must show that counsel's performance was deficient . . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). While post-conviction proceedings are often the most appropriate forum for review of ineffective assistance of counsel, we "may nevertheless reach the merits of the ineffectiveness issue where . . . the record affirmatively shows ineffectiveness of constitutional dimensions. . . ." *Read v. State*, 430 So. 2d 832, 841 (Miss. 1983).

In *Taylor*, the defendant was convicted of possessing stolen property and was sentenced as an habitual offender to ten years in prison. *Id*. at 1144 (¶1). Prior to trial, Taylor's counsel had filed a motion in limine to exclude evidence of Taylor's past criminal history. *Id*. at (¶3). The trial court delayed its ruling on the motion until trial, after Taylor had made his decision as to whether he would testify in his own defense. *Id*. At trial, just before Taylor took the stand to testify, the defense counsel withdrew his motion in limine. *Id*. Counsel advised the court that he was going to admit that he was a felon. The State reminded everyone that Taylor had three prior felony convictions. *Id*. Still, Taylor's attorney withdrew the motion and on direct examination, Taylor admitted that he had violated his probation for his conviction of the sale of cocaine. *Id*. at 1145 (¶13). On cross-examination, the State asked what felony crimes he had been convicted of. *Id*. Taylor responded that he had been convicted of house burglary, alteration of a motor vehicle VIN, possession of a firearm by a felon, grand larceny, and two cocaine charges—a total of six prior felony convictions. *Id*. at 1145-46 (¶¶3-4).

¶74. The supreme court reversed Taylor's conviction and remanded the matter for a new trial, holding:

31

We find that Taylor's right to a fair trial was compromised by defense counsel's withdrawal of the Motion in Limine regarding Taylor's criminal history and by failure to object to the State's extensive cross-examination regarding Taylor's prior convictions. When evaluating whether counsel's performance was deficient, trial counsel "is entitled to the presumption that his actions fell within the ambit of sound trial strategy, [but] that presumption is not absolute." *Herrington v. State*, 102 So. 3d 1241, 1246 (Miss. Ct. App. 2012). In a criminal trial on the lone charge of possession of stolen property, where the State's prime witness previously had changed his story to police about which individual he purchased the stolen property from, **we cannot conceive a trial strategy that would justify failure to object to the introduction and detailed description of the defendant's seven or eight previous felony convictions**. The State's extensive cross-examination regarding Taylor's numerous past felony convictions was clearly more prejudicial than probative in a case that largely turned on the respective credibility of Taylor and the State's main witness.

. . . We agree with Judge Irving's dissent in the Court of Appeals opinion that "it appears that Taylor's counsel thought that by placing Taylor on the stand, the prosecution was entitled to inquire, without any limitation, into the details of all of the prior convictions that Taylor had." **This erroneous assumption had a highly prejudicial effect on Taylor's defense**. . . .

We hold that Taylor was denied his constitutionally guaranteed right to effective assistance of counsel due to his attorney's failure to object to the introduction of Taylor's numerous past felony convictions on cross-examination. The prejudicial effect of these admissions clearly outweighed any probative value in allowing them.

*Id*. at 1146-47 (¶¶7-9) (Emphasis added). In the present case, if Carr assumed that the recording was inaudible, that assumption was in error and prejudiced Collins' claim of self-defense. Further, I cannot imagine a competent trial strategy that would justify Carr's failure to raise before the jury Roberson's aggressive and threatening behavior that was revealed on the apartment surveillance recording.

¶75. In a similar case where defense counsel failed to properly address the defendant's

criminal history, on direct appeal in *Timms v. State*, 54 So. 3d 310, 316 (¶20) (Miss. Ct. App. 2011), this Court reversed the defendant's conviction and determined:

> It is clear that Timms's trial counsel failed to render effective assistance of counsel. Timms's **trial counsel apparently knew nothing of Timms's actual criminal history**, allowed the State to introduce evidence of crimes that Timms had not been convicted of, failed to seek a stipulation as to Timms's status as a previously convicted felon, and then compounded these errors by questioning Timms and other witnesses as though Timms had been convicted of possessing a stolen firearm when he had not. For these reasons, we reverse and remand for a new trial at which Timms should receive constitutionally effective counsel.

(Emphasis added). In the present case, Carr apparently knew nothing about the audible parts of the recording that supported Collins' version of events, i.e., that he was being aggressively threatened by Roberson and feared for his safety.

¶76.    In *Sea v. State*, 49 So. 3d 614, 617 (¶8) (Miss. 2010), the defendant was acquitted by the jury on three counts of statutory rape and one count of sexual battery. However, Sea was convicted on five counts of sexual battery. *Id*. During the trial, defense counsel introduced evidence of Sea's two prior felony convictions, each over twenty years old, and, *more importantly for purposes of the present case, failed to properly prepare to challenge the admissibility of a video tape*. *Id.* at 618-19 (¶¶14, 21).  In reversing Sea's convictions the supreme court stated:

> Under these circumstances, evidence of Sea's prior convictions for sexual battery—one involving a child under thirteen years of age—was incendiary. This Court has stated "[e]vidence which is incompetent and inflammatory in character carries with it a presumption of prejudice."
>
> Additionally, we note that Sea's counsel failed to object to the introduction of

33

the videotaped interviews of the four victims. The tapes were rife with hearsay statements from both the victims and the interviewers. Not only did Sea's counsel fail to object contemporaneously to the admission of the videotapes, but he failed to request a hearing as required by our rules of evidence.

*Id*. at (¶¶20-21). Here, Carr filed no pre-trial motions to address issues presented by the recording from the apartment complex or for the jury to be able to hear an important portion of the recording that could have been vital to Collins' claim of self-defense.

¶77. On direct appeal in *Hibbler v. State*, 115 So. 3d 832, 834 (¶1) (Miss. Ct. App. 2012), this Court reversed Hibbler's conviction of statutory rape because he received ineffective assistance of counsel. Hibbler's counsel, Hosford, failed to interview witnesses and prepare for cross-examination of important witnesses called by the State. Citing *Davis v. Alaska*, 415 U.S. 308, 316 (1974), this Court noted that "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Hibbler*, 115 So. 3d at 840 (¶27). Hosford had information that the victim had previously accused someone else of raping her, but incorrectly believed that he would be prevented from introducing the evidence. *Id*. at (¶26). More importantly, Hosford had information that the victim had indicated that Hibbler did not rape her or have inappropriate contact with her, but Hosford did not cross-examine the victim with this information. *Id*. at (¶27). Ultimately, this Court concluded:

> "Defense counsel may not fail to conduct any investigation and then rely on the resulting ignorance to excuse his failure to explore a strategy that would likely have yielded exculpatory evidence." *Gersten* [*v. Senkowski*], 426 F.3d [588,] 610 [(2d Cir. 2005]. Based on a totality of the circumstances, we must conclude that there is a reasonable probability that, but for Hosford's deficient

performance, the result of Hibbler's trial would have been different. Accordingly, we reverse the judgment of the circuit court and remand this matter to the circuit court's active docket for retrial.

*Id*. at 843 (¶33). In *Murray v. State*, 345 So. 3d 610, 621 (¶28) (Miss. Ct. App. 2022), this Court discussed the meaning of "reasonable probability":

Stated differently, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. **A reasonable probability is a probability sufficient to undermine confidence in the outcome.**"

(Emphasis added).

¶78.    In conclusion, the majority contends that my dissent is premised upon speculation, assumptions and guesswork. The majority finds that "there is simply too much we do not know to conclude affirmatively that Collins' counsel was or was not ineffective." It is true many of the issues raised above could well be fleshed out in a post-conviction relief filing; however, that is not the end of our analysis. While many things concern the effectiveness of Carr's representation of Collins, which we may not be able to accurately discern from the appellate record, it is not what we do not know, but it is *what we do know* that should result in a reversal of Collins' conviction.

¶79.    As noted above in *Kirby*, our analysis of whether Carr's efforts in his representation of Collins were both deficient and prejudicial must be based upon an examination of the totality of the circumstances. I have set forth above many, but not all, acts or omissions by Carr that *could have* negatively impacted Collins' self-defense claim. It could be argued that some of these failures are the result of poor trial strategy, but just as in *Taylor*, I cannot

35

conceive a rational trial strategy that would excuse Carr's more serious failures.

¶80.    Carr's failure to know the law regarding the *Weathersby rule* and how it applies is inexcusable and deficient. Carr's failure to know how to lay a foundation to impeach a witness concerning pretrial statements made by Collins on a recording is inexcusable and deficient. Carr's failure to know how to proffer for appellate review Collins' recorded statements to law enforcement is inexcusable and deficient. These deficiencies in Carr's representation of Collins show his general lack of attention to the important details of the case and general lack of preparation to present Collins' self-defense claim at trial. Without question, Carr's lackadaisical approach in his representation of Collins prejudiced Collins' self-defense claim when Carr failed to hear and/or appreciate the extremely aggressive verbal attack upon Collins by Roberson just prior to the shots being fired. This is not speculation, assumption, personal opinion, or guesswork. This is recorded evidence that should have been used to support Collins' claim of self-defense. Carr's failure to prepare for and properly utilize this valuable piece of evidence is "sufficient to undermine confidence in the outcome" of Collins' trial. I would reverse the conviction and remand for a new trial.

**BARNES, C.J., AND McCARTY, J., JOIN THIS OPINION.**